Fiduciary Trust Co., executor,[1] & others[2] *vs.* Bingham, Dana & Gould & others.[3]

No. 99-P-1729.

Suffolk. May 6, 2002. - June 3, 2003.

Present: Brown, Perretta, & Kantrowitz, JJ.

*Attorney at Law,* Malpractice. *Partnership,* Attorneys, Vicarious liability.

The judge in a malpractice action properly granted summary judgment in favor of the defendants where, even assuming that there were factual disputes about whether the defendants negligently failed timely to advise the plaintiffs of insurance disclaimers and of an offer of settlement in an underlying lawsuit, the defendants' actions as a matter of law were not the cause of the plaintiffs' damages. [251-254]

Civil action commenced in the Superior Court Department on October 7, 1996.

The case was heard by *Maria I. Lopez,* J., on a motion for summary judgment.

*William F. Looney, Jr.,* for the plaintiffs.

*Richard M. Zielinski* for the defendants.

Perretta, J. This case is the aftermath of *Williams* v. *Ely*, 423 Mass. 467 (1996), wherein the liability on claims of legal malpractice brought by the Williams family against certain partners of the defunct law firm of Gaston Snow & Ely Bartlett

[1] Of the will of Richard Ely.

[2] Joseph B. Ely, Second, coexecutor of the will of Richard Ely; Rita B. Schmidt and Mark B. Schmidt, executors of the will of Arthur P. Schmidt; Chester M. Howe; Sheldon A. Jones; Alan L. Lefkowitz; and James M. Storey.

[3] Jay S. Zimmerman, individually and as representative of the members of Bingham, Dana & Gould; the members of Bingham, Dana & Gould; and Roger D. Feldman, the former managing partner of Gaston Snow & Ely Bartlett. The claim against Mr. Feldman was dismissed after he declared bankruptcy and secured an order from the Bankruptcy Court enjoining the plaintiffs from pursuing their claims against him.

(Gaston) was established. The Williams family was thereafter awarded $1.5 million. Each of the present plaintiffs was a Gaston partner at the time of the events giving rise to the malpractice claim and was personally required to pay about $250,000 to satisfy the award. They then brought this action in tort for legal malpractice against Bingham, Dana & Gould (Bingham), their counsel in the action brought by the Williams family. Concluding that the undisputed facts showed that Gaston's unforeseen bankruptcy was the proximate cause of the plaintiffs' losses, the judge allowed Bingham's motion for summary judgment. We affirm.

1. *Background.* On February 4, 1988, the Williams family brought an action against Gaston and its former partners in which they alleged that they had incurred a substantial Federal gift tax liability because of Gaston's negligent advice to them in 1975 and 1976. The issue of liability was separated from that of damages. *Williams* v. *Ely*, 423 Mass. at 469.

In 1975 and 1976, Messrs. Ely, Schmidt, Howe, Jones, Lefkowitz, and Storey (see notes 1 & 2, *supra*) were Gaston partners. With the exception of Mr. Schmidt, however, all had left Gaston no later than September, 1987. Mr. Schmidt departed in early 1988. All that aside, none of the plaintiffs had personal knowledge of the facts involved in the *Williams* case. Rather, their liability on the damages ultimately awarded the Williams family was based upon their partnership in Gaston at the time of the alleged malpractice.

2. *The undisputed facts.* We recite the undisputed facts, all of which have support in the materials placed in the record on Bingham's motion for summary judgment. Sometime in 1986, Gaston retained Bingham as counsel in anticipation of the action ultimately brought by the Williams family on February 4, 1988. See *Williams* v. *Ely*, 423 Mass. at 468. In October and November of that year, 1986, but before the plaintiffs had left Gaston, its insurers disclaimed coverage on any claims brought by the Williams family against the plaintiffs.[4]

On November 18, 1987, about one year after Gaston's receipt of notice that its insurers had disclaimed coverage, Mr. William

---

[4]The insurers refused coverage on the basis that the *Williams* matter occurred outside the effective dates of the policies.

Kehoe of Gaston informed Mr. Zachary Karol of Bingham about the insurance disclaimers. In the meantime, but no later than September, 1987, all the plaintiffs had left Gaston except for Mr. Schmidt. As earlier noted, he remained at Gaston until early 1988.

On February 18, 1988, about two weeks after the Williams family commenced suit against Gaston, Mr. Roger Feldman, the then managing partner of Gaston, directed a letter to thirty-seven former partners of Gaston, including the plaintiffs. In that letter, he asked the former partners whether they wished Bingham to represent them in the Williams family's action against Gaston. He made no mention of the fact that Gaston's insurers had disclaimed coverage. The letter provided:

> "*To the extent not covered by insurance*, the expense of defending this action and any judgment or settlement will be borne by the present partners of [Gaston]. If you agree to be represented by [Bingham], you will not be asked to pay anything toward their legal fees or expenses." (Emphasis supplied.)

All the plaintiffs elected to be represented by Bingham.

Sometime in late 1987 or early 1988, but prior to Mr. Feldman's letter of February 18, 1988, counsel for the Williams family informed Bingham that they might be willing to dismiss their claim against Gaston's former partners on the condition that they (the Williams family) could use the depositions of the former partners for any purpose, as if they were parties to the litigation. Bingham rejected the proposal.

On February 23, 1988, Mr. Alan Lefkowitz directed a letter to the managing partner of the law firm with whom he, Mr. James Storey, and Mr. Richard Ely were then engaged in the practice of law. In this letter, Mr. Lefkowitz stated, in part, that he understood that "there are two separate insurance policies applicable at different times during the relevant period but that both insurers have disclaimed liability. I understand that the deductible in each case is $1,000,000." Mr. Lefkowitz sent copies of his letter to Mr. Jones, Mr. Storey, and Mr. Ely.

In August or September of 1988, counsel for the Williams family again informed Bingham that they might be amenable to

dropping their claims against former Gaston partners under certain conditions. Mr. Karol, of Bingham, presented the Williams family's proposal to Gaston in a letter dated September 14, 1988. In that letter he stated that "[s]ince we [Bingham] represent both present and former partners, we must report [the] proposal to the former partners and solicit their reactions." Toward that end, he drafted a letter, dated September, 1988, and advised Gaston that it be sent to Gaston's former partners.

According to Mr. Karol's draft letter for Gaston's former partners, the Williams family would consider dismissing Gaston's former partners from the pending litigation on three conditions: (1) that the Williams family would retain the various procedural advantages arising out of the fact that Gaston's former partners were named as parties to the action, especially the right to pursue discovery from them and to use their statements as admissions of party-opponents; (2) that the Williams family would be allowed to conduct direct, ex parte interviews with those former Gaston partners willing to speak with them; and (3) that Gaston's current partners would be totally responsible for any judgment in favor of the Williams family. In Mr. Karol's opinion, the second and third conditions "present[ed] no problem but the first required further consideration."

Although the record is silent as to whether Gaston sent the draft letter to the former partners, it is undisputed that Gaston rejected the Williams family's proposal before the plaintiffs learned of it. Indeed, it was not until December 5, 1988, that Mr. Feldman advised the plaintiffs by letter that Gaston had rejected the Williams family's proposal. As explained by Mr. Feldman in his letter, Gaston's rejection was based upon the "substantial" procedural advantages sought by the Williams family in exchange for any settlement. At the same time, he reiterated:

> "We wish to reassure you, as I stated in my letter of February 18, 1988, that the present partners of [Gaston] will bear all the expenses of defending this action, including the amount of any judgment or settlement, to the extent not covered by insurance. . . . If you have any questions . . . please do not hesitate to contact me or [Mr. Karol]."

None of the plaintiffs contacted Mr. Feldman, Mr. Karol, or counsel for the Williams family in response to this letter.

On June 19, 1991, a Superior Court judge made findings and rulings and ordered judgment for the Williams family on the issue of Gaston's liability on their claims. Four months later, on October 10, 1991, Gaston, one of the oldest law firms in Boston, sought Chapter 11 bankruptcy protection. See *Williams* v. *Ely*, 423 Mass. at 469.

There was no discussion of bankruptcy at Gaston until September, 1991. Indeed, just two years prior to its petition for bankruptcy, Gaston had reported a net income of more than $22 million.[5] Further, there were no rumors about an impending bankruptcy until shortly before the Chapter 11 filing. Gaston's bankruptcy meant that both its current and former partners faced personal liability on any damages awarded the Williams family unless they availed themselves of the protection of the Bankruptcy Court. Although given the opportunity to participate in Gaston's bankruptcy plan under the same terms as the current partners, the plaintiffs chose not to do so.[6]

As a result of the change in Gaston's circumstances and the potential conflict between the interests of the plaintiffs and Gaston, Bingham withdrew from its representation of the plaintiffs, except as to those issues of common interest on which the former partners, including the plaintiffs, had agreed to be represented by Bingham.

Gaston's bankruptcy plan was confirmed on September 20, 1993. Under the plan, the Williams family retained their claims against Gaston's former partners, including the plaintiffs. On March 11, 1994, the Williams family was awarded damages. Each of the plaintiffs paid about $250,000, and, contrary to Mr. Feldman's letters of assurance, Gaston was unable to reimburse them. The plaintiffs then brought this action against Bingham.

3. *The plaintiffs' arguments.* The plaintiffs' claim of legal

---

[5]Gaston closed fiscal year 1987 on February 29, 1988, with gross revenues in the amount of $61 million with a net income of $21 million. It closed fiscal year 1988, ending on February 28, 1989, with gross revenues of about $70 million and a net income of about $22.5 million.

[6]The plaintiffs make no argument concerning the propriety of the judge's conclusions about Gaston's bankruptcy.

malpractice is based on two grounds: (1) Bingham failed to disclose that Gaston lacked insurance on the *Williams* action; and (2) Bingham violated its ethical obligations to them in rejecting the Williams family's settlement offer without disclosing it or its terms to them and without recommending that they seek independent representation.[7] As noted at the outset, the judge concluded that there was nothing in the record before her to show that Bingham's actions rather than Gaston's bankruptcy was the proximate cause of the plaintiffs' damages.

On appeal, the plaintiffs contend that the motion for summary judgment should not have been allowed because Bingham's "malpractice and the damages that flowed from it are inseparably intertwined factual issues." More specifically, they argue that the materials submitted on the motion for summary judgment showed that (1) not all the plaintiffs received Mr. Lefkowitz's letter of February 23, 1988; (2) even if all the plaintiffs received that letter, it was inconclusive about Gaston's insurance coverage; (3) Mr. Feldman's letter of December 5, 1988, reiterated the assertions in his February 18, 1988, letter and thereby affirmed the plaintiffs' belief that there was insurance coverage when, in fact, Gaston and Bingham knew there was not; (4) the plaintiffs' understanding of the letters concerning the availability of insurance coverage was a question of fact[8]; and (5) Bingham's ethical violations, see note 7, *supra,* were

---

[7]See Canons of Ethics and Disciplinary Rules Regulating the Practice of Law, S.J.C. Rule 3:07, Canon 5, DR 5-105(B), as appearing in 382 Mass. 781 (1981) (refusing to accept or continue employment if interests of another client may impair independent professional judgment), and DR 5-107(B), as appearing in 382 Mass. 782 (1981) (avoiding influence by others than the client), in effect at the relevant time. The Canons of Ethics and Disciplinary Rules have been replaced by the Massachusetts Rules of Professional Conduct, effective January 1, 1998. S.J.C. Rule 3.07, as appearing in 426 Mass. 1303 (1998).

[8]In her memorandum of decision, the judge noted that the undisputed facts, as shown by Mr. Lefkowitz's letter of February 23, 1988, established that Messrs. Lefkowitz, Jones, Storey, and Ely had actual knowledge of the insurance disclaimers and that all the plaintiffs, by reason of their partnership in Gaston, had constructive knowledge. See G. L. c. 108A, § 12, which reads:

"Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have com-

evidence of negligence. See *Fishman* v. *Brooks*, 396 Mass. 643, 649 (1986) (although violation of canon of ethics or disciplinary rule is not actionable breach of duty to client, it may be "some evidence of the attorney's negligence").

4. *Discussion.* We will assume without deciding that there were factual disputes about whether Bingham negligently failed timely to advise the plaintiffs of the insurance disclaimers and the Williams family's offer of settlement and, instead, pursue the question whether, on the undisputed facts, the motion judge correctly concluded that Gaston's bankruptcy and not Bingham's alleged negligence was the cause of their damages.

> "Summary judgment is appropriate when the moving party demonstrates, by reference to materials listed in Mass.R. Civ.P. 56(c), 365 Mass. 824 (1974), that the nonmoving party, who will have the burden of proof at trial, lacks sufficient evidence to establish an essential element of his or her claim. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). When asserting a claim for legal malpractice, a plaintiff bears the burden of proving that its attorney committed a breach of the duty to use reasonable care, that the plaintiff suffered actual loss, and that the attorney's negligence proximately caused such loss. *Colucci* v. *Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, 25 Mass. App. Ct. 107, 111 (1987). Proximate cause is an essential element of that proof. See *Jernigan* v. *Giard*, 398 Mass. 721, 723 (1986); *Meyer* v. *Wagner*, 429 Mass. 410, 424 (1999); *Girardi* v. *Gabriel*, 38 Mass. App. Ct. 553, 560 (1995)."

*Atlas Tack Corp.* v. *Donabed*, 47 Mass. App. Ct. 221, 226 (1999). Cf. *McCann* v. *Davis, Malm & D'Agostine*, 423 Mass. 558, 560 (1996) ("evidence fully warranted the finding . . . that the firm's negligence caused no damage to the plaintiff ").

Although Gaston, while represented by Bingham, never expressly advised the plaintiffs that insurance coverage existed, it did twice assure them (on February 18 and December 5,

municated it to the acting partner operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner."

1988) that it would indemnify them "to the extent not covered by insurance" and bear all the expenses of defending against the Williams family action. Even assuming that the plaintiffs construed the letters to mean that insurance coverage was available and that they did not know that Gaston's insurers had disclaimed coverage, there is nothing in the record to show what the plaintiffs could or would have done to protect themselves from personal liability on any judgment other than to accept Gaston's promises to indemnify them.[9] See *Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, 25 Mass. App. Ct. at 111; *O'Connor v. SmithKline Bio-Science Labs., Inc.*, 36 Mass. App. Ct. 360, 363-365 (1994); *Girardi v. Gabriel*, 38 Mass. App. Ct. 553, 560 (1995).[10] See also 1 Mallen & Smith, Legal Malpractice § 8.5, at 806 (5th ed. 2000) ("The causal link between the lawyer's conduct and the injury must be based on more than speculation. A logical explanation or theory of how the lawyer's conduct *may* have caused the loss is still speculation" [emphasis supplied]).

This reasoning is equally applicable to the plaintiffs' claim that Bingham violated the canons of ethics by its dual representation of them and Gaston with respect to the offers of settlement made by the Williams family. As earlier related, the undisputed chronology of events is as follows: (1) the plaintiffs knew about the proposed offer of settlement from Mr. Feldman's letter of December 5, 1988; (2) on June 19, 1991, a Superior Court judge concluded that Gaston was liable on the Williams family's claim; (3) there was no discussion about bankruptcy at Gaston until September, 1991; (4) Gaston sought bankruptcy protection on October 10, 1991; and (5) the plaintiffs did not seek new counsel during this three-year hiatus, nor did

---

[9]Clearly and as matter of law, the plaintiffs could not have purchased their own insurance to cover the known risk of the Williams family's claim. See *SCA Servs., Inc.* v. *Transportation Ins. Co.*, 419 Mass. 528, 532-533 (1995).

[10]Although the plaintiffs argue on appeal that they would have offered expert testimony on this issue at trial, they fail to point to anything in the record before us to show that this argument has support in the materials they submitted in response to Bingham's motion for summary judgment. See *Atlas Tack Corp.* v. *Donabed*, 47 Mass. App. Ct. at 225-226, citing *DiPiero* v. *Goodman*, 14 Mass. App. Ct. 929, 929-930 (1982), cert. denied, 460 U.S. 1029 (1983); *Colucci* v. *Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, 25 Mass. App. Ct. at 115.

they choose to participate in Gaston's bankruptcy plan which was confirmed in 1993. Even were we to accept the plaintiffs' assertions that they would have sought new counsel had they known of the settlement offer prior to December 5, 1988, they presented nothing to show what any newly retained counsel would or could have done to negotiate a favorable settlement agreement with the Williams family on their behalf.

Bingham also asserts that, based on the undisputed facts, Gaston's bankruptcy was the intervening and superseding cause of the plaintiffs' damages. Once again and as earlier noted, the plaintiffs offered nothing to dispute the facts that there were neither public rumors nor in-house discussion about Gaston's bankruptcy until September, 1991; that as of February 28, 1989, Gaston closed its fiscal years with gross revenues of about $70 million and a net income of about $22.5 million; and that the plaintiffs chose not to participate in Gaston's bankruptcy plan that was ultimately confirmed on September 20, 1993. See notes 5 & 6, *supra*. Instead, they argue that causation is a jury question. See *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 794 (1987) ("Generally, questions of causation, proximate and intervening, present issues for the jury to decide"), citing *Lane* v. *Atlantic Works*, 111 Mass. 136, 140 (1872), as well as other authorities. The plaintiffs make their argument without consideration or discussion of the question of foreseeability.

> "The general rule is that '[t]he act of a third person, intervening and contributing a condition necessary to the injurious effect of the original negligence, will not excuse the first wrongdoer, if such act ought to have been *foreseen*. The original negligence still remains a culpable and direct cause of the injury. The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise.' *Lane* v. *Atlantic Works*, *supra* at 139-140." (Emphasis added.)

*Jesionek* v. *Massachusetts Port Authy.*, 376 Mass. 101, 105 (1978). See *Wilborg* v. *Denzell*, 359 Mass. 279, 285 (1971) ("defendant is liable for the foreseeable intervening conduct of a third party whether that conduct is negligent or not"); *Jones* v. *Cincinnati, Inc.*, 32 Mass. App. Ct. 365, 370 (1992), quoting

from *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. at 795-796, quoting from *McDonald* v. *Snelling*, 14 Allen 290, 296 (1867) ("issue of superseding cause is resolved 'not in the number of intervening events or agents, but in their character, and in the natural and probable connection between the wrong done and the injurious consequence' "); Restatement (Second) of Torts § 442 (1965) (setting out relevant factors to be considered in determining whether intervening act is superseding cause).[11]

The plaintiffs offered nothing to refute or even to suggest that Gaston's bankruptcy was reasonably foreseeable to Bingham at the time they claim they first heard of the Williams family's offer of settlement, December 5, 1988. For all that appears from the undisputed facts in the materials before us, the plaintiffs would have suffered no harm had Gaston not declared bankruptcy. See *Poskus* v. *Lombardo's of Randolph, Inc.*, 423 Mass. 637, 640-641 (1996).

*Judgment affirmed.*

---

[11]Those factors are: the cause must have occurred after the original negligence; the cause [Gaston's bankruptcy] must not be a consequence of the attorney's [Bingham's] negligence; the cause must produce a result that would not have otherwise followed from the original negligence; and the cause must not be reasonably foreseeable. See 1 Mallen & Smith, Legal Malpractice § 8.5, at 813.