Opinion
MOSK, Acting P. J.
INTRODUCTION
Defendant, a seller of real property, breached the real estate sales contract with plaintiff, the buyer, by causing the closing of the escrow to be delayed so that it did not close on the agreed-upon Friday set forth in the contract. The sale was part of an Internal Revenue Code (26 U.S.C.) section 1031 (section 1031) transaction to defer the buyer’s capital gains tax on the buyer’s sale of another property. The buyer had the money payable on his sale of the other property deposited in a segregated account with a section 1031 qualified exchange intermediary (section 1031 intermediary).[1] On the Monday after the *1264 sale had been scheduled to close, the section 1031 intermediary closed and then filed for bankruptcy. The bankruptcy court did not release the buyer’s money until after it was too late legally to qualify for deferral of taxes under section 1031.
A jury found the seller and the escrow company at fault for the escrow not closing on time—i.e., on Friday—and awarded the buyer damages against the seller for the delay, including the loss of the tax benefits. The jury also found the escrow company liable for breach of fiduciary duty and awarded the buyer damages against the escrow company for losses resulting from the delay in the closing of escrow.
We reverse in part because, as discussed in the published portion of the opinion, (a) there was insufficient evidence the contract damages assessed against the seller based on the bankruptcy were foreseeable and (b), as to the escrow company, the trial court failed to instruct the jury on an intervening and superseding cause—the bankruptcy.
FACTUAL BACKGROUND[2]
Plaintiff David Ash as trustee of the David Ash Trust (Ash), in connection with his sale of commercial real estate that realized a taxable gain, desired to defer the capital gains tax under section 1031[3] by purchasing commercial property from defendant Lerner.[4] On October 8, 2008, Ash and Lemer entered into an agreement by which Lemer agreed to sell to Ash commercial property. Defendant North American Title Company (NAT) was selected to be the escrow company for the purchase, for which escrow opened shortly thereafter, and was scheduled to close on November 21, 2008—the “expected closing date.”
*1265 Ash was in the real estate business, and, after talking to different brokers, selected LandAmerica 1031 Exchange Services, Inc. (LandAmerica), to receive proceeds from the sale of his property in order to comply with section 1031.[5] When he entered into the agreement with LandAmerica, he had no concerns about its “financial viability.” He chose LandAmerica based on “the opinion of the [p]eople [he] spoke to about it.” When asked if he was “scared to lose [his] money if he got into a 1031 exchange,'” he responded “no.” Ash was told LandAmerica had various branches and was part of LandAmerica Commercial Services. Ash had used LandAmerica for another replacement property.
At some point during the escrow period after the purchase and escrow agreements were executed, Ash had concerns: “I was afraid of the whole industry everywhere . . . the banking system was, like, collapsing at the time. So—I also needed income. So I wanted to do something as quick as possible to get my income and also to be protected.” He had nevertheless chosen to use LandAmerica, signing the papers on November 13, 2008, over a month after escrow opened, although the paperwork with LandAmerica was dated as of October 9, 2008. He later said that near the closing date he was worried about his money because he wanted the income: “I wanted to get it done.” Ash had told NAT that he needed the income from the property he purchased. Ash never said he was concerned at any time specifically about the financial condition of LandAmerica.
Under section 1031, in order to defer paying the capital gains tax on the sale of his other property, Ash was required to close his transaction with Lemer within 180 days of the sale of Ash’s property.[6] Ash had the proceeds from the sale of his property on which the escrow had closed deposited with LandAmerica, using an account at Citibank. This was a segregated account that paid a lower interest rate than an account that pooled money from other investors. Ash verified that the funds were in the Citibank account.
Neither Lerner nor NAT had any involvement with the selection of LandAmerica. As noted, the escrow was to close on Friday, November 21, *1266 2008, but it was anticipated by both defendants that the escrow would take a few more days to close. When so informed, Ash responded, “no problem do I get a discount[©] (jk) [just kidding]. Thank you!!” Ash’s response expressed no concern about the status of LandAmerica. On Monday, November 24, 2008, LandAmerica froze all of its accounts, including segregated accounts, and then filed for bankruptcy.
Ash’s real estate broker was aware of LandAmerica and the number of people who used it. He believed it was a “very substantial company” and a “very large company” and knew of its affiliated companies. He said he told Ash it was a reputable company. Ash’s broker said he too was “shocked” and “everybody was shocked” when LandAmerica closed its doors. Ash had expressed no concerns to Lemer or to NAT about the financial solvency of LandAmerica. The escrow officer at NAT who had worked with LandAmerica had no concerns about the solvency of LandAmerica prior to the bankruptcy. She said she was “shocked” upon hearing LandAmerica had closed.
Ash’s expert, who once worked for LandAmerica, said it was “unusual,” “alarming,” and “unique” that LandAmerica closed its doors. She added that escrow holders would not get information about rumors concerning a section 1031 qualified intermediary, and if they did, they would not necessarily inform the principals to escrow accounts of such rumors. She could not say that any such rumors about LandAmerica were generally known by people in the real estate industry in Southern California. There is no evidence that Ash, and more importantly defendants, were aware of any such rumors about LandAmerica. The real estate agents involved, in addition to the escrow officer for NAT, said they were “shocked” and surprised about LandAmerica’s bankruptcy. A LandAmerica employee handling the matter said she had been involved in 5,000 or more section 1031 exchanges and apparently had no warning of an impending LandAmerica bankruptcy. That LandAmerica employee said, “There was never any doubt until 9:00 a.m. on the morning of November 24 [(the date the business closed)] that the money would be available.” She added that the event was so traumatic that it was even worse than the death of her father—“worse than anything”; “absolutely beyond description.” She added, “everybody [at LandAmerica] was very angry and couldn’t understand how it could happen.” Another LandAmerica employee said she had no awareness of any financial problems with LandAmerica. Ash’s real estate agent, who had been in the industry for more than 35 years and involved with section 1031 exchanges, said this was the first one in which a qualified intermediary failed to fund the escrow.[7] Despite Ash’s *1267 hopes and the fact that the money was in a segregated account, the bankruptcy court refused to allow depositors, including Ash, to have access to their deposited monies.
Ash did not cancel the transaction because he was concerned he might lose his deposits and would be unable to complete the tax-deferred exchange. He continued to pay interest on the bank loan he had taken out to purchase the property without the income from the property to use for loan payments. The bank required Ash to repay the loan after five months because there was no deed of trust recorded to secure the loan. Without income from the property, he was required to borrow money from his mother. He also needed to hire an attorney to attempt to convince the bankruptcy court to release his money in order to complete the transaction.
The escrow did not close until March 2010, after the bankruptcy court finally released Ash’s funds. The closing of escrow was too late for Ash to obtain the section 1031 tax deferral of his capital gains taxes.[8]
As a result of the delayed escrow and the delay in recovering his funds resulting from the bankruptcy, Ash sued Lemer and NAT for damages, including Ash’s legal expenses of $140,000 incurred in the bankruptcy proceeding and tax liability of $465,000 due to the failure of the section 1031 exchange. Additionally, Ash claimed $166,000 for income from the property if the sale had been timely completed, payments to the lender of $42,000, $189,000 paid for a new loan above what he would have paid for the original loan that was terminated by the original lender, and $28,000 of interest on a loan to meet expenses. These direct damages totaled $1,033,000.[9] Ash also sought indirect damages of $1 million attributed to his loss of cash flow to retain and purchase properties.
Defendants made motions for nonsuit based on a lack of causation and the defense of intervening and superseding cause. The trial court denied the motions and refused to give defendants’ proposed instructions on causation and intervening/superseding cause.
The jury returned its verdict, finding that Lemer breached its contract by delaying the timely close of escrow and was liable to Ash for $300,000, and *1268 that NAT breached its contract with Ash to provide proper and timely escrow and title services and was liable for $250,000 in contract damages. The jury also found that NAT was liable for negligence in the amount of $500,000 and for breach of fiduciary duty in the amount of $250,000. The jury imposed punitive damages on NAT in the amount of $750,000. The trial court granted NAT’s motion for judgment notwithstanding the verdict as to the punitive damage award, but otherwise denied the motions for new trial and judgment notwithstanding the verdict. Lerner and NAT timely appealed. Ash cross-appealed in connection with the punitive damages.
DISCUSSION
A. Standard of Review
The determinations of whether there was a breach of contract and whether the contract damages were foreseeable are questions of fact (Pint v. Fireman’s Fund Ins. Co. (2000) 85 Cal.App.4th 98, 105-106 [102 Cal.Rptr.2d 36]; Sun-Maid Raisin Growers v. Victor Packing Co. (1983) 146 Cal.App.3d 787, 790 [194 Cal.Rptr. 612]; Porter v. Arthur Murray, Inc. (1967) 249 Cal.App.2d 410, 421 [57 Cal.Rptr. 554]) and are governed by the substantial evidence test (Garlock Sealing Technologies, LLC v. NAK Sealing Technologies Corp. (2007) 148 Cal.App.4th 937, 955-956 [56 Cal.Rptr.3d 177]; Lenk v. Total-Western, Inc. (2001) 89 Cal.App.4th 959, 968 [108 Cal.Rptr.2d 34])— i.e., whether there is substantial evidence to support the findings of the trier of fact. “ ‘Substantial evidence ... is not synonymous with “any” evidence.’ Instead, it is ‘ “ ‘substantial’ proof of the essentials which the law requires.” ’ [Citations.]” {Roddenberry v. Roddenberry (1996) 44 Cal.App.4th 634, 651 [51 Cal.Rptr.2d 907].) We view the evidence in the light most favorable to the prevailing party and draw all reasonable inferences and resolve all conflicts in its favor. {Hub City Solid Waste Services, Inc. v. City of Compton (2010) 186 Cal.App.4th 1114, 1128-1129 [112 Cal.Rptr.3d 647].) Regarding whether the failure to give an instruction on intervening and superseding cause was error, we use the de novo standard of review. (Collins v. Navistar, Inc. (2013) 214 Cal.App.4th 1486, 1500 [155 Cal.Rptr.3d 137].)
B. Damages Against Lerner and NAT for Breach of Contract—Foreseeability
“Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable. . . . [|] In contrast, tort damages are awarded to compensate the victim for injury suffered. [Citation.] ‘For the breach of an obligation not arising from contract, the measure of damages . . . *1269 is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.’ (Civ. Code, § 3333.)” (Applied Equipment Corp. v. Litton Saudi Arabia Ltd. (1994) 7 Cal.4th 503, 515-516 [28 Cal.Rptr.2d 475, 869 P.2d 454].)
The court in Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist. (2004) 34 Cal.4th 960, 969 [22 Cal.Rptr.3d 340, 102 P.3d 257] (Lewis Jorge) discussed the contract damage principle, pointing out that California follows the common law rule set forth by an English court in Hadley v. Baxendale (1854) 156 Eng.Rep. 145. In that venerable English case, a shaft in Hadley’s mill broke rendering the mill inoperable. Hadley contracted with Baxendale to transport the shaft to an engineer to make a duplicate. Hadley told Baxendale the shaft should be sent immediately, and Baxendale promised to have it delivered the next day. Baxendale did not know the mill would be inoperable until the new shaft arrived. Baxendale did not transport the shaft in the promised time, causing the mill to be shut down for an additional five days. Hadley sued, inter alia, for lost profits resulting from the delay. The court held that although a plaintiff is entitled to an amount that will place it in the same position in which it would have been had the breaching party performed, damages for special circumstances, such as in that case, can be assessed against the breaching party only when they were within the contemplation of both parties as a probable consequence of a breach. Baxendale did not know that the mill would be shut down and would remain shut until the new shaft arrived. Loss of profits could not fairly or reasonably have been contemplated by both parties without Hadley having communicated the special circumstances to Baxendale. Thus, the court, in reversing the judgment, held that lost profits could not be awarded to Hadley. (Id. at p. 152.)
The court in Lewis Jorge, supra, 34 Cal.4th at pages 969 through 970 added, “Hadley did not expressly distinguish between general and special damages. But such a distinction flows naturally from that case; hence the rule that a party assumes the risk of special damages liability for unusual losses arising from special circumstances only if it was ‘advised of the facts concerning special harm which might result’ from breach—it is not deemed to have assumed such additional risk, however, simply by entering into the contract. [Citations.] [f] The Hadley mle has long been applied by California courts, which view it as having been incorporated into California Civil Code section 3300’s definition of the damages available for breach of a contract. [Citations.] Contract damages, unlike damages in tort (Civ. Code, § 3333), do not permit recovery for unanticipated injury. [Citation.] Parties may voluntarily assume the risk of liability for unusual losses, but to do so they must be told, at the time the contract is made, of any special harm likely to result from a breach [citations]. Alternatively, the nature of the contract or the *1270 circumstances in which it is made may compel the inference that the defendant should have contemplated the fact that such a loss would be ‘the probable result’ of the defendant’s breach. [Citation.] Not recoverable as special damages are those ‘beyond the expectations of the parties.’ [Citation.] Special damages for breach of contract are limited to losses that were either actually foreseen [citation] or were ‘reasonably foreseeable’ when the contract was formed. [Citation.]” (See Erlich v. Menezes (1999) 21 Cal.4th 543, 550 [87 Cal.Rptr.2d 886, 981 P.2d 978]; Greenwich S.F., LLC v. Wong (2010) 190 Cal.App.4th 739, 760 [118 Cal.Rptr.3d 531] [special damages not foreseeable as a matter of law]; see also California Press Mfg. Co. v. Stafford Packing Co. (1923) 192 Cal. 479, 483 [221 P. 345].) In III Farnsworth on Contracts (3d ed. 2004) section 12.14, pages 260 to 262 (Farnsworth), the author sets forth the criteria for foreseeability in part as follows: “foreseeability is to be determined as of the time of the making of the contract . . .”; “what must be foreseeable is only that the loss would result if the breach occurred”; “it is foreseeability only by the party in breach that is determinative”; “foreseeability has an objective character”; and “the loss need only have been foreseeable as a probable, as opposed to a necessary or certain, result of the breach.”
The instant case is governed by the Hadley v. Baxendale, supra, 156 Eng.Rep. 145 principle adopted by our Supreme Court. To the extent any part of the $250,000 of damages for the breaches of contract by Lemer and NAT is attributable to expenses incurred in connection with the bankruptcy and the loss of the deferral of the capital gains tax, such damages are not general damages, i.e., those “ ‘which, in the ordinary course of things, would- be likely to result’ ” from the breach (Civ. Code, § 3300) and which “flow directly and necessarily from a breach of contract, or that are a natural result of a breach” and are within the contemplation of the parties. (Lewis Jorge, supra, 34 Cal.4th at p. 968.) Rather, they “are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties.” (Ibid.) These “[s]pecial damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test).” (Id. at pp. 968-969.) Moreover, “[s]pecial damages ‘will not be presumed from the mere breach’ but represent loss that ‘occurred by reason of injuries following from’ the breach. [Citation.]” (Id. at p. 969.)
Because counsel’s arguments to the jury are not evidence, we look to the testimony of the witnesses and the documents introduced as exhibits to assess the foreseeability of the bankruptcy. There is no evidence in the record that Ash communicated to Lemer or NAT at the time of contracting—the relevant time—or at any time, that the bankruptcy of LandAmerica and indefinite freezing of segregated accounts could result from a short but untimely delay *1271 in the escrow closing. There is no evidence in the record, expert or otherwise, that Lemer or NAT knew or should have known of this risk at the time of contracting or anytime. The transaction in issue took place in the fall of 2008, during an economic recession. Evidence of the various events that allegedly took place during 2008 and their timing is not in the record. There is no evidence as to what facts Lemer or NAT knew concerning those events. Whatever Ash’s apprehensions were are irrelevant. Only the communications to or knowledge of Lemer and NAT are relevant to foreseeability.
Ash, even though ostensibly risk averse, having been in the real estate business and having consulted others in the business, chose the 1031 exchange intermediary and purportedly protected himself by having the proceeds of his sale deposited in a segregated account. There is not substantial, if any, evidence that under these circumstances, Ash was aware of any risk to the funds he placed in a segregated account, much less that he communicated any such risk to Lemer or NAT or that Lemer or NAT should have known of any such risk. That Ash was not aware of any risk supports the position that neither Lemer nor NAT was aware or should have been aware of any such risk at the time of the contract.
The real estate brokers and agents involved, an escrow expert, and a LandAmerica employee, all testified that they did not foresee any risk to the funds deposited with LandAmerica. Ash’s damages expert stated that what occurred is “a fairly rare occurrence” and is “fairly unusual.” Again, this evidence dispels any notion that Lemer or NAT were aware of or should have foreseen the risk of bankruptcy. Lemer just wanted to sell his property, and NAT was just the escrow company. Presumably, it did not matter to Lemer or NAT whether the sale was part of a section 1031 exchange, other than the exchange was what motivated the buyer, Ash.
To suggest that Lemer and NAT should have known of the risk is speculation and not based on any evidence. There is no evidence that the parties to the transaction were concerned that the economy or other institutional failures created a risk to the funds placed in a segregated account with LandAmerica. The evidence does not show that LandAmerica was part of purported banking system problems of which Ash was aware. He had used LandAmerica for escrow and other services before. There is nothing in the record or even argued by Ash concerning the precise nature of economic conditions at the time of the contract and how they might have impacted a section 1031 qualified intermediary such as LandAmerica, which is not a bank. There was no evidence that Lemer and NAT knew or should have known at the time of contracting that if the escrow did not close in time, the section 1031 qualified intermediary selected by Ash would or could go bankrupt or that Ash would or might not be able to recover his funds in time *1272 to qualify for a tax deferral. The papers appointing LandAmerica to serve as a section 1031 intermediary were signed over a month after the escrow opened. Thus, defendants did not contemplate the LandAmerica bankruptcy or the consequences thereof.
That there is no evidence in the record that at the time of the contracts the bankruptcy of LandAmerica was reasonably foreseeable by any of the participants—most importantly, Lemer and NAT—is consistent with the general view that bankruptcies normally are not within the contemplation of the parties at the time of a contract. (See Fiduciary Trust Co. v. Bingham, Dana & Gould (2003) 58 Mass.App.Ct. 245 [789 N.E.2d 171, 178] [“plaintiffs offered nothing to refute or even to suggest that Gaston’s bankruptcy was reasonably foreseeable ... at the time . . .” of defendant’s alleged malpractice]; Martin Marietta Corp. v. Fireman’s Fund Ins. Co. (4th Cir. 1988) 852 F.2d 566, 570 [“financial ruin of an apparently sound company is not normally a foreseeable consequence of those acts”]; Held Construction Co. v. Michigan National Bank of Detroit (Mich.Ct.App. 1983) 124 Mich.App. 472 [335 N.W.2d 8, 10]; In re Construction Diversification, Inc. (Bankr. E.D.Mich. 1983) 36 B.R. 434, 439 [bankruptcy damages not recoverable in breach of contract action absent bad faith]; Howard v. Nicholson (Mo.Ct.App. 1977) 556 S.W.2d 477, 483 [“While the possibility of bankruptcy of businesses in general is a foreseeable and all-too-frequent occurrence, the future bankruptcy of a particular company, the continuing existence of which was essential to complete the entire transaction, was not reasonably within the contemplation of the parties at the time of contracting such that , the parties would have made provision for such an event.”].)[10] As stated in one authoritative work, “[u]nless financial ruin is a consequence arising naturally from a breach of contract, damages sought by the nonbreaching party for financial ruin' are not recoverable unless a risk of insolvency was within the actual contemplation of the parties at the time the contract was made.” (Henshaw & Kimpflen, 7 Mich. Civ. Jurisprudence, Damages (2013) § 77.)
There are certain situations, unlike the one here, in which a bankruptcy is foreseeable if there is a breach of contract. For example, when a health maintenance organization improperly terminates a contract with a health care provider, it can expect dire financial consequences will arise for the latter. (See In re Doctors Health, Inc. v. Nylcare Health Plans of the Mid-Atlantic, Inc. (Bankr. D.Md. 2005) 335 B.R. 95, 121.) If the breaching party breaches a contract to purchase stock when he knows of the other party’s desperate financial need to sell the stock, a bankruptcy might be considered foreseeable. (See Hallmark v. Hand (Tex.App. 1992) 833 S.W.2d 603, 612.) When an insurer wrongfully refuses to pay a claim, the adverse financial consequences can be foreseeable. (Cf. Reichert v. General Ins. Co. of America (1968) 68 *1273 Cal.2d 822 [69 Cal.Rptr. 321, 442 P.2d 377] [issue not reached].) Here, there was no evidence the parties considered the bankruptcy of LandAmerica to be a foreseeable consequence of any delay. As noted, Ash deposited the sums in a segregated account with the understanding they would be safe. If he thought they were safe, there was no reason to conclude that defendants nevertheless should have contemplated that the deposit was unsafe.
Also, there was no evidence that Lemer or NAT had any knowledge at the time of contracting of the possibility that a bankruptcy judge for such a lengthy period of time would not release the money in a segregated account. Indeed, under the circumstances, it was unforeseeable that a bankruptcy court would not release the funds in an account, especially in a segregated account, in time to meet the requirements for a tax-free exchange. (See Funk, supra, vol. 25, No. 2, Prac. Tax. Law. 43; Matson & Smith, Committee Educational Session: Bankruptcy Taxation/Real Estate: Lessons from LandAmerica: Who Has My Money? The Unexpected Perils of § 541, Dec. 1, 2011, American Bankruptcy Institute 449, 459 [“Outrage and acrimony over the Court’s decision [in the LandAmerica case]”]; Siegel v. Boston (In re Sale Guaranty Corp.) (Bankr. 9th Cir. 1998) 220 B.R. 660, affd. sub nom. Siegel v. Newman (9th Cir. 2000) 199 F.3d 1375 [funds deposited in a separate trust account of qualified intermediary are not property of the bankruptcy estate].) Moreover, there was no evidence that defendants at the time of the contracts had knowledge that Ash would incur expenses related to the bankruptcy.
As stated in Williston on Contracts, “If the contract is silent with respect to the risks the defendant has assumed, the court will determine what risks were foreseen or foreseeable when the contract was made by viewing the matter in the light of common sense; and the courts will consider the nature and purpose of the contract, and the surrounding circumstances known by the parties to exist at that time, as well as what the breaching party may reasonably be supposed to have assumed consciously.” (24 Williston on Contracts (4th ed. 2002) § 64.13, p. 136.) Because there was no evidence that the bankruptcy judge’s refusal to release funds in a segregated account was, at the time of the contracts, within the contemplation of Lemer and NAT or that at those times they should have contemplated the probability of the result, the damages arising from those events were not foreseeable for purposes of awarding contract damages.
Accordingly, the trial court should reduce the contract damages judgment against Lemer and NAT by amounts attributable to the bankruptcy and the bankruptcy court’s delay in releasing the deposited funds. The matter is remanded for determination of damages not attributable to the bankruptcy, including the legal fees in that proceeding and the bankruptcy court’s delay in releasing the funds.
*1274 C. Intervening and Superseding Cause
Defendants invoked the tort defense of intervening and superseding cause, but the trial court refused to instruct the jury on those defenses. A principle in tort law is that when “subsequent to the defendant’s negligent act, an independent intervening force actively operates to produce the injury, the chain of causation may be broken. It is usually said that if the risk of injury might have been reasonably foreseen, the defendant is liable, but that if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it is a superseding cause, and the defendant is not liable.” (6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1197, p. 574 and case cited therein.)
The Restatement Second of Torts distinguishes between “superseding cause” and “intervening force.” The Restatement Second of Torts, section 440, provides that “a superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.” The Restatement Second of Torts, section 441, subdivision (1) states, “An intervening force is one which actively operates in producing harm to another after the actor’s negligent act or omission has been committed.” Another authority states, “An intervening act is regarded as a superseding cause when it is outside the scope of the risk the defendant negligently created. This idea is usually expressed in shorthand by saying that if the intervening act is itself unforeseeable then it may become a superseding cause.” (1 Dobbs et al., The Law of Torts (2d ed. 2011) § 212, p. 741 (Dobbs).)
A superseding cause relieves a defendant from tort liability for a plaintiff’s injuries, if both the intervening act and the results of the act are not foreseeable. “[W]hat is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence.” (Bigbee v. Pacific Tel & Tel Co. (1983) 34 Cal.3d 49, 57-58 [192 Cal.Rptr. 857, 665 P.2d 947].) “Whether an intervening force is superseding or not generally presents a question of fact, but becomes a matter of law where only one reasonable conclusion may be reached. [Citation.]” (Chanda v. Federal Home Loans Corp. (2013) 215 Cal.App.4th 746, 756 [155 Cal.Rptr.3d 693]; see Perez v. VAS S.p.A. (2010) 188 Cal.App.4th 658, 680-681 [115 Cal.Rptr.3d 590].)
The defense of intervening and superseding cause applies in tort cases. In contract cases, the defense does not absolve the defendant of liability, although closely related is the principle that if the special damages are not foreseeable and proximately caused by the breach of contract they are *1275 not recoverable.[11] As one authority has noted, “Breach may not be precluded, however, by the presence of other contributing causes—multiple or intervening. Although the injured party’s own failure to avoid loss may bar recovery for that loss, this is not thought of as a consequence of a requirement of causation but of a limitation under a ‘mitigation’ rule.” (Farnsworth, supra, § 12.1, p. 151, fns. omitted.) Thus, the Lemers cannot invoke the defense of intervening and superseding cause applicable to torts because no tort claims were asserted against them.[12]
Ash contends that the claims against NAT include an intentional tort, and therefore the intervening and superseding act doctrine does not apply, as it applies only to NAT’s negligence. Ash asserts that so long as the intentional tort of breach of fiduciary duty was a substantial factor in causing the harm, NAT cannot escape liability even if there were an intervening and superseding cause. (United States Fid. & Guar. Co. v. American Employer’s Ins. Co. (1984) 159 Cal.App.3d 277, 285 [205 Cal.Rptr. 460] [“ ‘[T]he notion of independent intervening cause has no place in the law of intentional torts, so long as there is a factual chain of causation.’ ” (quoting Tate v. Canonica (1960) 180 Cal.App.2d 898, 907 [5 Cal.Rptr. 28])], disapproved on other grounds in J. C. Penney Casualty Ins. Co. v. M. K. (1991) 52 Cal.3d 1009, 1019, fn. 8 [278 Cal.Rptr. 64, 804 P.2d 689]; Bank of New York v. Fremont General Corp. (9th Cir. 2008) 523 F.3d 902, 910; Null v. City of Los Angeles (1988) 206 Cal.App.3d 1528, 1535, fn. 6 [254 Cal.Rptr. 492]; Rest.2d Torts, §§ 435A, 435B; but see Brewer v. Teano (1995) 40 Cal.App.4th 1024, 1036 [47 Cal.Rptr.2d 348] [“This comes close to pleading an intentional tort. From that prospect, the doctrine of superseding cause is less likely to cut off the chain of events put in motion by the original conduct of the tortfeasor . . . even the ‘but for’ consequences of an intentional tort are not without limitation.”]; Wright, The Grounds and Extent of Legal Responsibility (2003) 40 San Diego L.Rev. 1425, 1478 [“The superseding cause limitation applies to all tort actions, including the intentional torts.”].) Assuming, without deciding, that the defense of intervening and superseding cause does not *1276 apply to any intentional tort, we must examine the claim against NAT, which claim was breach of fiduciary duty.
“ ‘The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach.’ ” (Gutierrez v. Girardi (2011) 194 Cal.App.4th 925, 932 [125 Cal.Rptr.3d 210].) The breach of fiduciary duty can be based upon either negligence or fraud depending on the circumstances. (See Salahutdin v. Valley of California, Inc. (1994) 24 Cal.App.4th 555, 563 [29 Cal.Rptr.2d 463]; see also Federal Deposit Ins. Corp. v. McSweeney (S.D.Cal. 1991) 772 F.Supp. 1154, 1157.) It has been referred to as a species of tort distinct from causes of action for professional negligence (Slovensky v. Friedman (2006) 142 Cal.App.4th 1518, 1534 [49 Cal.Rptr.3d 60]) and from fraud (Salahutdin v. Valley of California, Inc., supra, 24 Cal.App.4th at p. 562).
The trial court instructed the jury as follows: “The Ash Trust claims that it was harmed by NATCO’S breach of the fiduciary duty to use reasonable care. To establish this claim, the Ash Trust must prove all of the following: 1. That NATCO was the Ash Trust escrow holder; 2. That NATCO acted on the Ash Trust’s behalf for purposes of purchasing a commercial property; 3. That NATCO failed to act as a reasonably careful escrow holder would have acted under the same or similar circumstances; 4. That the Ash Trust was harmed; and 5. That NATCO’s conduct was a substantial factor in causing the Ash Trust’s harm.” The trial court did not instruct the jury that it was required to find the breach of fiduciary duty to be intentional. And the trial court refused to instruct the jury on constructive fraud.
As it appears that the breach of fiduciary duty might have arisen from negligence, the intervening and superseding act doctrine could have been applicable. As suggested above, there is a question as to whether the intervening and superseding act doctrine is applicable to intentional torts. And, as noted above, in Brewer v. Teano, supra, 40 Cal.App.4th at page 1036, the court said that the doctrine “is less likely to cut off the chain of events put in motion by the original conduct of the tortfeasor.”[13] In Tate v. Canónica, supra, 180 Cal.App.2d at page 909, the court noted that the rule on an intervening and superseding act would apply “where the act of the defendant *1277 was intentionally done, but there was no intent to cause injury.” (Italics omitted.) We do not have to decide whether an intervening or superseding act can be a defense to an intentional tort because here the trial court did not instruct the jury that in order to find a breach of fiduciary duty, it had to find that NAT intentionally breached its fiduciary duty.
Also, the intervening and superseding act itself need not necessarily be a negligent or intentional tort. For example, the culpability of the third person committing the intervening or superseding act is just one factor in determining if an intervening force is a new and independent superseding cause. (Rest.2d Torts, § 442, subds. (e) & (f); see Dobbs, supra, § 210, pp. 729-732 [acts of nature]; 4 Harper et al. on Torts (3d ed. 2007) § 20.5, p. 180 [“new and unforeseeable force”].)
Our Supreme Court has pointed out that “[a] tort is a legal cause of injury only when it is a substantial factor in producing the injury.” (Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298] (Soule).) As relevant here, the court added, “This principle is distinct from the defense of ‘superseding cause,’ which absolves a tortfeasor, even though his conduct was a substantial contributing factor, when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible. [Citations.] It is also distinct from the doctrine of ‘concurrent causes,’ which holds that when two or more tortious acts combine, each contributing significantly to a single ultimate harm, each act is deemed a substantial and legal cause of injury, making each concurrent tortfeasor fully liable. [Citations.]” (Id. at p. 573, fn. 9.)
The trial court refused a proposed jury instruction on intervening and superseding cause (CACI No. 432), which instruction was based on NAT’s defense theory. A party is entitled to nonargumentative and correct instructions it requests on every theory advanced by that party if the theory is supported by substantial evidence. (Soule, supra, 8 Cal.4th at p. 572.) We review the evidence most favorable to the applicability of the requested instruction, as a party is entitled to that instruction if that evidence could establish the elements of the theory presented. (Scott v. Rayhrer (2010) 185 Cal.App.4th 1535, 1540 [111 Cal.Rptr.3d 36].) But “ ‘[a] judgment will not be reversed for error[] in jury instructions unless it appears reasonably probable that, absent the error, the jury would have rendered a verdict more favorable to the appellant. [Citation.]’ [Citation.]” (Ibid.)
NAT contended at trial that LandAmerica’s bankruptcy, the ensuing freezing of the segregated account, and the bankruptcy court’s refusal to release *1278 the funds occurred after NAT’s conduct caused Ash his damage and were highly unusual. NAT claimed it had no reason to expect such occurrences, and the resulting harm was different from that which could be expected from NAT’s conduct. There was sufficient evidence that the bankruptcy constituted “an independent event [intervening] in the chain of causation, producing harm of a kind and degree so far beyond the risk” (Soule, supra, 8 Cal.4th at p. 573, fn. 9) that NAT should have foreseen, that the jury should have been given the intervening and superseding cause instruction. The failure to give that instruction constituted error. (See id. at p. 573 & fn. 10.)
Moreover, the error was prejudicial. The general instructions on causation do not render the error harmless because the doctrine of intervening and superseding cause assumes that a defendant’s conduct was a substantial contributory factor—i.e., that there was causation. (Soule, supra, 8 Cal.4th at p. 573, fn. 9.) The jury finding that NAT was responsible for $250,000 as foreseeable contract damages suggests that the remaining $750,000 of Ash’s tort damages against NAT for negligence and breach of fiduciary duty were not based on the contract standard of damages but on tort principles. As the jury was not given an instruction on the defenses of intervening and superseding cause, it could not properly consider whether NAT should be responsible for a tort or tort damages. That NAT’s conduct was found to be wrongful does not determine whether an intervening and superseding event relieves NAT of liability. Had the jury been instructed on intervening and superseding cause, it is reasonably probable that it would have come to a different result, for damages were caused by the bankruptcy proceedings—an independent event that caused a harm that could not be foreseen by NAT. (Soule, supra, 8 Cal.4th at p. 573, fn. 9.)
This conclusion is evident from our determination that in view of the evidentiary presentations in this case, the bankruptcy events were unusual and not reasonably foreseeable. “Since the court’s general instruction on causation did not go into the circumstances of this particular case but dealt with the defense of superseding cause by negative implication only, the jury may well have overlooked that defense in untangling the issues and arriving at its verdict.” (Self v. General Motors Corp. (1974) 42 Cal.App.3d 1, 10 [116 Cal.Rptr. 575], disapproved on other grounds in Soule, supra, 8 Cal.4th at p. 580.) Moreover, as the contract damages for the bankruptcy were not foreseeable, those damages should not be invoked to render the instructional error harmless.
D. Other Contentions*
*1279 E. Conclusion
We reverse and remand the matter for retrial on the issue of damages for breach of contract and as to tort liability of NAT consistent with this opinion. (See Torres v. Automobile Club of So. California (1997) 15 Cal.4th 771, 782 [63 Cal.Rptr.2d 859, 937 P.2d 290]; Bowman v. Wyatt (2010) 186 Cal.App.4th 286, 332 [111 Cal.Rptr.3d 787]; Bliss v. Cal. Cooperative Producers (1952) 112 Cal.App.2d 507 [247 P.2d 85].) The issues to be retried are not so inextricably intertwined that a complete new trial as to the breach of contract claims is required. (See Liadas v. Sahadi (1977) 19 Cal.3d 278, 284—285 [137 Cal.Rptr. 635, 562 P.2d 316].)
DISPOSITION
We affirm as to the liability of Lemer and NAT for breach of contract. We reverse and remand the matter as to contract damages as to Lemer and NAT and tort liability of NAT. Each party shall bear his or its own costs of appeal.
Kumar, J.,* concurred.

 (See Department of Treasury Internal Revenue Service Regulations: IRC § 1031, Preamble to Regulations: Deferred Exchanges, “Definition of qualified intermediary,” p. R23; id. § 1.1031(k)-l(g)(4), pp. R33-R34.)

 We do not state in detail the facts concerning the liability of defendants because the issues in the published portion of this opinion involve damages and jury instructions.

 “Under section 1031, no taxable gain or loss is recognized on the exchange of properties of like kind if both the property surrendered and the property received are held either ‘for productive use in a trade or business or for investment.’ (26 U.S.C. § 1031(a)(1).) This section ‘allows taxpayers with profitable real estate investments to swap them for other real estate without paying tax.’ (2 Greenwald & Asimow. Cal. Practice Guide: Real Property Transactions (The Rutter Group 2009) f 13:305.1, p. 13-58 (rev. # 1, 2009).” (Sharabianlou v. Karp (2010) 181 Cal.App.4th 1133, 1140, fn. 5 [105 Cal.Rptr.3d 300].)

 The defendants were Richard and Gloria Lemer, as trustees of the Exemption Tmst of the Lemer Family Tmst dated November 17, 1986. Also referred to as defendants and owners of the property are Richard and Gloria Lemer, as trastees of the Ray Lemer Irrevocable Tmst dated December 30, 1992. They are collectively referred to as Lerner.

 Ash originally said he was going to use TIMCOR as an intermediary, “and I think WAMU [(Washington Mutual)] bought them or something happened, and both of them disappeared or went bankrupt or something. . . . I’m not sure if they went out of business or if they were bought out by Washington Mutual and then Washington Mutual closed them down and then went out of business. But somehow, it was all lumped together, from what I know, or what I was told.”

 The property being purchased must be identified within 45 days after the sale, and the purchase must take place within 180 days of the sale. (Tit. 26 U.S.C. § 1031(a)(3).) Up to three potential properties may be identified. (Tit. 26 U.S.C. § 1031(a)(3).) Section 1031 can be simply a deferral of the capital gains tax if the taxpayer later sells the property he or she acquired.

 LandAmerica apparently failed because it invested its funds in auction rate securities, the market for which collapsed in February of 2008. (See Funk, So You Thought Your Proceeds Belonged To You? The Interplay Between Like-Kind Exchanges Under The Tax and Bankruptcy Codes (2011) vol. 25, No. 2, Prac. Tax. Law. 43, 50-51 (Funk).) The chief operating officer of *1267 LandAmerica told “everybody how great everything was . . . and that he had no idea there was a bankruptcy imminent.” He added that the “mother company” “had promised to, if necessary, buy those securities to make the accommodator [(1031 intermediary)] liquid.” He also said that the “mother company” had guaranteed the accommodator funds.

 Ash, nevertheless, on his tax return treated his sale of property as nontaxable, and then later amended the return to show the gain.

 The $3,000 discrepancy is due to rounding off some figures by the expert.

 These cases appear to have decided the issue of foreseeability as a matter of law.

 See VerSteeg, Perspectives on Foreseeability in the Law of Contracts and Torts: The Relationship Between “Intervening Causes” and “Impossibility” (2011) 2011 Mich. St. L.Rev. 1497, 1510, fns. omitted (“The Contract doctrine that we typically label as ‘impossibility, impracticability, frustration of purpose,’ or, as the Uniform Commercial Code refers to it, ‘failure of presupposed conditions,’ and the Tort doctrine of ‘intervening and superseding causes’ are actually one and the same.”).

 See Schneider, Consequential Damages in the International Sale of Goods: Analysis of Two Decisions (1995) 16 U. Pa. J. Int’l Bus. L. 615, 629, section 2.2.4.1, footnote 74 (“When a contract is breached or a tort committed, resulting losses or damage may not be caused by the actual breach or the tort itself, but rather by multiple or intervening causes .... Such multiple or intervening causes are less likely to relieve a defendant from contractual liability than from tort liability.”); Farnsworth, supra, section 12.1, page 151, footnote 9 (“Although the same problems of multiple causes and of intervening causes that enliven the law of torts also arise in connection with contract damages, they are relatively less important than in the law of torts.”).

 In Ventas, Inc. v. Health Care Property Investors, Inc. (W.D.Ky. 2009) 635 F.Supp.2d 612, 624, the court predicted Kentucky law would apply the intervening and superseding cause doctrine to intentional torts, relying on a Kentucky comparative fault statute that applied to both negligent and intentional torts. In California, comparative fault only applies to negligence causes of action. (People v. Brunette (2011) 194 Cal.App.4th 268, 282 [124 Cal.Rptr.3d 521].) In Hibma v. Odegaard (7th Cir. 1985) 769 F.2d 1147, the court held that the deputy sheriffs who framed the plaintiff were not liable to the plaintiff for a sexual assault on the plaintiff by other prisoners.

See footnote, ante, page 1258.

Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.